R. Andrew Jones (Admitted *Pro Hac Vice*)
Cory Watson, P.C.
2131 Magnolia Ave South
Birmingham, AL 35205
Telephone: (205) 328-2200
Fax: (205) 324-7896
ajones@corywatson.com

Jon C. Conlin (Admitted *Pro Hac Vice*)
Cory Watson, P.C.
2131 Magnolia Ave South
Birmingham, AL 35205
Telephone: (205) 328-2200
Fax: (205) 324-7896
jconlin@corywatson.com

Nicolas Gutierrez (Admitted *Pro Hac Vice*)
Cory Watson, P.C.
2131 Magnolia Ave South
Birmingham, AL 35205
Telephone: (205) 328-2200
Fax: (205) 324-7896
ngutierrez@corywatson.com

*Attorneys for Plaintiffs*

'26CV5945 JO VET

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ANGIODYNAMICS, INC., AND NAVILYST MEDICAL, INC., PORT CATHETER PRODUCTS LIABILITY LITIGATION | Case No.: 3:24-md-03125-JO-VET<br>MDL No. 3125<br><br>JUDGE JINSOOK OHTA |

STEPHEN EARL SIMMONS
Plaintiff
v.
ANGIODYNAMICS, INC., &
NAVILYST MEDICAL, INC., AND
PFM MEDICAL, INC.
Defendants

COMPLAINT AND JURY DEMAND

## COMPLAINT

Plaintiff files this Complaint pursuant to CMO No. 1, and is bound by the rights, protections, privileges, and obligations of that CMO. In accordance with CMO No. 1, Plaintiff hereby designates the United States District Court for the District of Arizona as Plaintiff's venue as this case may have originally been filed there pursuant to 28 U.S.C. §1391.

**COMES NOW** Plaintiff, STEPHEN EARL SIMMONS (hereinafter "Plaintiff"), by and through undersigned counsel, and brings this Complaint against AngioDynamics, Inc., Navilyst Medical, Inc., and PFM Medical, Inc., (collectively, the "Defendants"), and alleges as follows:

1. This is an action for damages arising out of failures relating to Defendants' design, development, testing, assembling, manufacturing, packaging, promoting, marketing, distribution, supplying, and/or selling of defective implantable vascular access devices sold under the trade name of AngioDynamics, including the port implanted in Plaintiff (hereinafter "AngioDynamics Port" or "Defective Device").

## PARTIES

2. Plaintiff, STEPHEN EARL SIMMONS, is an adult resident and citizen of Maricopa County, Arizona, and claims damages as set forth below.

3. Defendant AngioDynamics, Inc. ("AngioDynamics") is a Delaware corporation

with its principal place of business located in Latham, New York. AngioDynamics conducts business throughout the United States, including the State of Arizona. AngioDynamics is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the AngioDynamics Port.

4. Defendant Navilyst Medical, Inc. ("Navilyst") is a Delaware corporation with its principal place of business located in Marlborough, Massachusetts. Navilyst conducts business throughout the United States, including the State of Arizona, and is a wholly owned subsidiary of AngioDynamics. Navilyst is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the AngioDynamics Port.

5. Defendant PFM Medical, Inc., is a Cologne, Germany corporation with its principal place of business located in Carlsbad, California. PFM Medical Inc. is a medical device manufacturer and distributor who conducts business throughout the United States, including the State of Arizona. PFM Medical, Inc., is engaged in the business of developing, manufacturing, marketing, and distributing throughout the United States its medical devices, either directly or indirectly through third parties or related entities, including the AngioDynamics Port.

## <u>JURISDICTION AND VENUE</u>

6. This Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. §1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and cost.

7. Venue is proper in this Court pursuant to 28 U.S.C. §1391 by virtue of the facts that (a) a substantial part of the events or omissions giving rise to the claims occurred in this District, and (b) Defendants' products are produced, sold to, and consumed by

individuals in the State of Arizona, thereby subjecting Defendants to personal jurisdiction in this action and making them all "residents" of this judicial District.

8. Defendants have and continue to conduct substantial business in the State of Arizona and in this District, distribute vascular access products in this District, receive substantial compensation and profits from sales of vascular access products in this District, and made material omissions and misrepresentations and breaches of warranties in this District, so as to subject them to *in personam* jurisdiction in this District.

9. Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, the District of Arizona has *in personam* jurisdiction over Defendants because Defendants are present in the State of Arizona, such that requiring an appearance does not offend traditional notices of fair and substantial justice.

## **PRODUCT BACKGROUND**

10. The AngioDynamics Port is one of several varieties of port/catheter systems that has been designed, manufactured, marketed, and sold by Defendants.

11. For instance, the SmartPort was originally marketed and sold as Vortex® CT Port Access System, when, in or about 2007, a company called Rita Medical Systems, Inc. received clearance via the 510(k) Premarket Notification Program from the Food and Drug Administration (FDA) to market and sell it.

12. Around the same time, AngioDynamics completed the acquisition of the assets and liabilities of Rita Medical Systems, Inc. and rebranded the subject product as SmartPort CT.

13. In or about 2008, another port catheter device, the Xcela port, received clearance via the 510(k) Premarket Notification Program from the Food and Drug Administration (FDA) to be marketed and sold by the Defendants.

14. Defendants' Vascular Access Devices were designed, patented, manufactured, labeled, marketed, sold, and distributed by the Defendants at all relevant times herein.

15. According to Defendants, the AngioDynamics Port is a totally implantable vascular access device designed to provide repeated access to the vascular system for the delivery of medication, intravenous fluids, parenteral nutrition solutions, and blood products.

16. The intended purpose of the AngioDynamics Port is to make it easier to deliver medications directly into the patient's bloodstream. The device is surgically placed completely under the skin and left implanted.

17. The AngioDynamics Port is a system consisting of two primary components: an injection port and a catheter, made of polyurethane or silicone, which includes additives intended to make it radiopaque.

18. The injection port has a raised center, or "septum," where the needle is inserted for delivery of the medication. The medication is carried from the port into the bloodstream through a small, flexible tube, called a catheter, that is inserted into a blood vessel.

19. The AngioDynamics Port is indicated for patient therapies requiring repeated access to the vascular system. The port system can be used for infusion of medications, I.V. fluids, parenteral nutrition solutions, blood products, and for the withdrawal of blood samples.

20. The product's catheter is comprised of a polymeric mixture of silicone or polyurethane and a barium sulfate radiopacity agent.

21. Barium sulfate is known to contribute to reduction of the mechanical integrity of silicone *in vivo* as the particles of barium sulfate dissociate from the surface of the catheter over time, leaving microfractures and other alterations of the polymeric structure and degrading the mechanical properties of the silicone.

22. Researchers have shown that catheter surface degradation in products featuring a radiopaque barium sulfate stripe is concentrated at the locus of the stripe.[1]

23. The mechanical integrity of a barium sulfate-impregnated silicone is affected by the concentration of barium sulfate as well as the heterogeneity of the modified polymer.

24. Upon information and belief, Defendants' manufacturing process in designing and constructing the specific catheter implanted in Plaintiff involved too high a concentration of barium sulfate particles for the polymer formulation, leading to improperly high viscosity of the admixed silicone before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix.

25. This defect in the manufacturing process led to a heterogeneous modified polymer which led to an irregular catheter surface replete with fissure, pits and cracks as well as sections of the catheter lumen which contain more than 30% barium sulfate by weight, reducing the catheter strength at those loci.

26. The roughened catheter surface also leads to the collection and proliferation of fibrinous blood products, thereby drastically increasing the risk of biofilm, infection, sepsis.

27. Although the surface degradation and resultant mechanical failure can be reduced or avoided with design modifications (e.g., using a higher grade radiopacity compound and/or encapsulating the admixed polymer within the silicone), Defendants elected not to incorporate those design elements into the AngioDynamics Port.

28. At all times relevant, Defendants misrepresented the safety of the AngioDynamics Port system, and negligently designed, manufactured, prepared, compounded, assembled, processed, labeled, marketed, distributed, and sold the AngioDynamics Port system as safe and effective device to be surgically implanted to provide repeated access to the vascular system for the delivery of medications, intravenous

---

[1] See Hecker JF, Scandrett LA. Roughness and thrombogenicity of the outer surfaces of intravascular catheters. *J Biomed Mater Res*. 1985;19(4):381-395. doi:10.1002/jbm.820190404

fluids, parenteral nutrition solutions, and blood products.

29. At all times relevant to this action, Defendants knew and had reason to know, that the AngioDynamics Port was not safe for the patients for whom they were prescribed and implanted, because once implanted the device was prone to fracturing, perforating internal vasculature, and otherwise malfunctioning.

30. At all times relevant to this action, Defendants knew and had reason to know that patients implanted with a AngioDynamics Port had an increased risk of suffering life threatening injuries, including but not limited to: death; infection; hemorrhage; thrombus; cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart); cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; and perforations of tissue, vessels and organs, or the need for additional surgeries to remove the defective device.

31. Soon after the AngioDynamics Port was introduced to market, which was years before Plaintiff was implanted with his device, Defendants began receiving large numbers of adverse event reports ("AERs") from health care providers reporting that the AngioDynamics Port was fracturing post-implantation and that fractured pieces were migrating throughout the human body, including to the heart and lungs. Defendants also received large numbers of AERs reporting that AngioDynamics Port was found to have perforated internal vasculature. These failures were often associated with reports of severe patient injuries such as:

a. hemorrhage.
b. infection/sepsis;
c. thrombus;
d. cardiac/pericardial tamponade;
e. cardiac arrhythmia and other symptoms similar to myocardial infarction;
f. severe and persistent pain;
g. perforations of tissue, vessels and organs; and
h. upon information and belief, even death.

32. In addition to the large number of AERs, which were known to Defendants and reflected in publicly accessible databases, there are many recorded device failures and/or injuries related to the Defendants' implantable port products which were concealed from medical professionals and patients through submission to the FDA's controversial Alternative Summary Reporting ("ASR") program.

33. The FDA halted the ASR program after its existence was exposed by a multi-part investigative piece, prompting a widespread outcry from medical professionals and patient advocacy groups.[2]

34. Prior to the discontinuation of the ASR program, Defendants reported numerous episodes of failures of their implanted port/catheter products – including episodes of infection – under the ASR exemption, thereby concealing them from physicians and patients.

35. Defendants were aware or should have been aware that the AngioDynamics Port had a substantially higher failure rate than other similar products on the market, yet Defendants failed to warn consumers of this fact.

36. Defendants also intentionally concealed the severity of complications caused by the AngioDynamics Port and the likelihood of these events occurring.

37. Rather than alter the design of the AngioDynamics Port to make it safer or adequately warn physicians of the dangers associated with the AngioDynamics Port, Defendants continued to actively and aggressively market the AngioDynamics Port as safe, despite their knowledge of numerous reports of infection and associated injuries.

38. Moreover, Defendants concealed—and continue to conceal—their knowledge of the AngioDynamics Port's dangerous propensity to precipitate injuries, including, but not limited to, infection, thrombus, and catheter fracture. Defendants further concealed

[2] Christina Jewett, *Hidden Harm: Hidden FDA Reports Detail Harm Caused by Scores of Medical Devices*, Kaiser Health News (Mar. 2019)

their knowledge that the catheter design caused these failures and that these failures cause serious injuries.

39. The conduct of Defendants, as alleged in this Complaint, constitutes willful, wanton, gross, and outrageous corporate conduct that demonstrates a conscious disregard for the safety of Plaintiff. Defendants had actual knowledge of the dangers presented by the AngioDynamics Port system, yet consciously failed to act reasonably to:

a. Adequately inform or warn Plaintiff, his prescribing physicians, or the public at large of these dangers;
b. Establish and maintain an adequate quality and post-market surveillance system; or
c. Recall the AngioDynamics Port system from the market.

**SPECIFIC FACTUAL ALLEGATIONS AS TO STEPHEN EARL SIMMONS**

40. On or about September 30, 2024, Plaintiff underwent placement of an AngioDynamics Port product, model/reference number unknown, lot number 582768. The device was implanted by Dr. Gordon Hougland at Banner Boswell Medical Center in Sun City, Arizona for the purpose of providing chemotherapy.

41. On or about November 18, 2024, Plaintiff's Port was found to be infected, and Plaintiff was diagnosed with sepsis. Port removal was recommended.

42. On or about November 19, 2024, Plaintiff's port was removed by Dr. Gordon Hougland at Banner Boswell Medical Center.

43. Defendants, directly or through their agents, apparent agents, servants, or employees designed, manufactured, marketed, advertised, distributed, and sold the AngioDynamics Port that was implanted in Plaintiff.

44. Defendants manufactured, sold, and/or distributed the AngioDynamics Port to Plaintiff, through his doctors, to be used for chemotherapy.

45. At all times, the AngioDynamics Port was utilized and implanted in a manner foreseeable to Defendants, as Defendants generated the instructions for use and created procedures for implanting the product.

46. The AngioDynamics Port implanted in Plaintiff was in the same or substantially similar condition as when the AngioDynamics Port left the possession of Defendants and in the condition directed by and expected by Defendants.

47. Plaintiff and his physicians foreseeably used and implanted the AngioDynamics Port and did not misuse or alter the AngioDynamics Port in an unforeseeable manner.

48. Defendants advertised, promoted, marketed, sold, and distributed the AngioDynamics Port as a safe medical device when Defendants knew or should have known the AngioDynamics Port was not safe for its intended purposes and that the product could cause serious medical problems.

49. Defendants had sole access to material facts concerning the defective nature of the AngioDynamics Port product and its propensity to cause serious and dangerous side effects.

50. In reliance on Defendants' representations, Plaintiff's doctors were induced to, and did use the AngioDynamics Port.

51. As a result of having the AngioDynamics Port implanted, Plaintiff experienced significant mental and physical pain and suffering, underwent additional surgeries, and suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses.

52. Defendants' AngioDynamics Port was marketed to the medical community and to patients as a safe, effective, reliable, medical devices implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, and as safer and more effective as compared to the traditional products and procedures for treatment and other competing Vascular Access Devices.

53. The Defendants have marketed and sold the Defendants' AngioDynamics Port to the medical community at large and patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, direct to consumer advertising, aggressive marketing to health care providers at medical conferences, hospitals, private offices, and/or group purchasing organizations, and include a provision of valuable consideration and benefits to the aforementioned.

54. The injuries, conditions, and complications suffered due to Defendants' AngioDynamics Port include, but are not limited to, fracture and leakage; necrosis; infection; blood clots/thrombus; cardiac/pericardial tamponade; cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; perforations of tissue, vessels and organs; and even death.

55. Defendants were negligent toward Plaintiff in the following respects:

a. Defendants failed to design and establish a safe, effective procedure for removal of AngioDynamics Port; therefore, in the event of a failure, injury, or complications it is difficult to safely remove AngioDynamics Port.

b. Defendants provided incomplete, insufficient, and misleading information to physicians in order to increase the number of physicians using AngioDynamics Port for the purpose of increasing their sales. By so doing, Defendants caused the dissemination of inadequate and misleading information to patients, including the Plaintiff.

56. The AngioDynamics Port was utilized and implanted in a manner foreseeable to Defendants.

57. The AngioDynamics Port implanted into Plaintiff was in the same or substantially similar condition as when it left the possession of the Defendants and in the condition directed by the Defendants.

58. At the time of his implant operation, Plaintiff was not informed of, and had no knowledge of the complaints, known complications and risks associated with

AngioDynamics Port, including, but not limited to, the extent of seriousness of the danger of infection.

59. Plaintiff was never informed by Defendants of the defective and dangerous nature of AngioDynamics Port.

60. At the time of his implant, neither Plaintiff nor Plaintiff's physicians were aware of the defective and dangerous condition of the AngioDynamics Port.

61. As a result of the Defendants' actions and inactions, Plaintiff was injured due to the use of the AngioDynamics Port, which caused Plaintiff's various physical, mental, and emotional injuries and damages.

62. Plaintiff also incurred substantial medical bills and suffered loss of other monies due to the defective product that was implanted in his body.

## **COUNT I: NEGLIGENCE**

(Against Defendants AngioDynamics, Navilyst, and PFM Medical)

63. Plaintiff incorporates by reference paragraphs one (1) through sixty-three (63) of this Complaint as if fully set forth herein.

64. The Defendants owed Plaintiff a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, selling and conducting post-market surveillance of the AngioDynamics Port.

65. The Defendants failed to exercise due care under the circumstances and therefore breached this duty by:

a. Failing to properly and thoroughly test the AngioDynamics Port before releasing the device to market, and/or failing to implement feasible safety improvements;

b. Failing to properly and thoroughly analyze the data resulting from any pre-market testing of the AngioDynamics Port;

c. Failing to conduct sufficient post-market testing and surveillance of the AngioDynamics Port;

d. Failing to comply with state and federal regulations concerning the study, testing, design, development, manufacture, inspection, production, advertisement, marketing, promotion, distribution, and/or sale of the AngioDynamics Port;

e. Designing, manufacturing, marketing, advertising, distributing, and selling the AngioDynamics Port to consumers, including Plaintiff, without an adequate warning of the significant and dangerous risks of the AngioDynamics Port and without proper instructions to avoid the harm which could foreseeably occur as a result of using the device;

f. Failing to exercise due care when advertising and promoting the AngioDynamics Port; and

g. Negligently continuing to manufacture, market, advertise, and distribute the AngioDynamics Port after Defendants knew or should have known of its adverse effects.

66. As a direct, actual, and proximate cause of the Defendants' actions, omissions, and misrepresentations, Plaintiff suffered severe injuries and complications which were permanent and lasting in nature, emotional distress, loss of the capacity for the enjoyment of life, medical expenses, and economic loss, as alleged herein.

67. In performing the foregoing acts, omissions, and misrepresentations, Defendants acted grossly negligent, fraudulently, and with malice so as to justify an award of punitive and/or exemplary damages.

## **COUNT IV: STRICT PRODUCTS LIABILITY – DESIGN DEFECT**

(Against Defendants AngioDynamics, Navilyst, and PFM Medical)

68. Plaintiff incorporates by reference paragraphs one (1) through sixty-three (63) of this Complaint as if fully set forth herein .

69. Defendants supplied, manufactured, sold, distributed and/or otherwise placed into the stream of commerce the AngioDynamics Port implanted into Plaintiff.

70. The AngioDynamics Port implanted in Plaintiff was not reasonably safe for its intended use and was defective with respect to its design.

71. Defendants' design decision of how it chose to utilize barium sulfate and its specific process for mixing it with polyurethane/silicone leads to a structurally compromised catheter, thereby creating a defective condition and heightened risk to the user or consumer.

72. The AngioDynamics Port was in a defective condition and was defective in its design such that when it left the possession of Defendants, it was not safe for its anticipated use and safer, more reasonable alternative designs existed that could have been utilized by Defendants.

73. The AngioDynamics Port was unreasonably dangerous to the user or consumer, taking into consideration the utility of said product and the risks involved in its use. The foreseeable risks associated with the design of the product were more dangerous than a reasonably prudent consumer such as Plaintiff and/or his physicians would expect when the product was used for its normal and intended purpose.

74. The AngioDynamics Port was expected to and did reach the consumer without substantial change in the condition in which it was supplied, distributed, sold and/or otherwise placed into the stream of commerce.

75. A reasonably prudent medical device manufacturer would not have placed the AngioDynamics Port with its defective design into the stream of commerce due to the likelihood that the AngioDynamics Port's design would cause injuries similar to those sustained by Plaintiff and that the gravity of the injuries outweighed the Defendants' burden of adopting a safer and more reasonable alternative design.

76. The design defects in the AngioDynamics Port were not known, knowable and/or reasonably apparent to Plaintiff and/or his physician or discoverable upon any reasonable examination.

77. The AngioDynamics Port was used and implanted in the manner in which it was intended to be used and implanted by Defendants pursuant to the instructions for use

and the product specifications provided by Defendants.

78. Defendants are strictly liable to the Plaintiff for designing, manufacturing, marketing, labeling, packaging and selling a defective product.

79. As a direct and proximate result of the AngioDynamics Port's aforementioned defects, the Plaintiff was caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

## COUNT V: STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT

(Against Defendants AngioDynamics, Navilyst, and PFM Medical)

80. Plaintiff incorporates by reference paragraphs one (1) through sixty-three (63) of this Complaint as if fully set forth herein .

81. The AngioDynamics Port implanted in the Plaintiff was not reasonably safe for its intended use as it was manufactured defectively.

82. Defendants operated under design and manufacturing specifications for the AngioDynamics Port, which included appropriate material content, strength, size, durability appearance, resistance levels, and that the devices did not deviate from its intended design. The manufacturing process was intended to identify any end-product products that did not meet Defendants' specifications.

83. Defendants owed Plaintiff a duty to exercise reasonable care when manufacturing, setting design and manufacturing specifications, exercising quality control over, distributing, and selling the AngioDynamics Port.

84. Defendants breached this duty and failed to exercise reasonable care when manufacturing, setting design and manufacturing specifications, exercising quality control over, distributing, and selling an unreasonably dangerous AngioDynamics Port that was ultimately implanted into Plaintiff. This caused the AngioDynamics Port that was implanted into Plaintiff to deviate from its intended design and/or vary from its intended specifications in that the device did not have the specified material content, size, durability,

and strength, resulting in a AngioDynamics Port that contained too high a concentration of barium sulfate particles for the polymer formulation, leading to improperly high viscosity of the admixed polyurethane before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix.

85. The defective and dangerous condition of the AngioDynamics Port implanted into Plaintiff existed at the time it left Defendants' possession and at the time it was sold. The device differed from Defendants' intended result and/or from other ostensibly identical units of the same product line.

86. AngioDynamics Port ports were expected to and did reach consumers, including the Plaintiff, without substantial change in the condition in which it was supplied, distributed, sold and/or otherwise placed into the stream of commerce.

87. A reasonably prudent medical device manufacturer would have recognized the manufacturing and design defects of the AngioDynamics Port and would not have placed the AngioDynamics Port into the stream of commerce.

88. The manufacturing and design defects in the AngioDynamics Port were not known, knowable and/or reasonably apparent to Plaintiff and/or his physicians or discoverable upon any reasonable examination.

89. Plaintiff's AngioDynamics Port was used and implanted in the manner in which it was intended to be used and implanted by Defendants pursuant to the instructions for use and the product specifications provided by Defendants.

90. As a direct and proximate result of Defendants' negligent manufacturing, Plaintiff suffered severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, economic loss and damages including, but not limited to medical expenses, lost income, and other damages.

91. WHEREFORE, Plaintiff demands judgment against Defendants for compensatory, special, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**COUNT VI: STRICT PRODUCTS LIABILITY – FAILURE TO WARN**

(Against Defendants AngioDynamics, Navilyst, and PFM Medical)

92. Plaintiff incorporates by reference paragraphs one (1) through sixty-three (63) of this Complaint as if fully set forth herein .

93. At the time Defendants designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the device into the stream of commerce, the device was defective and presented a substantial danger to users of the product when put to its intended and reasonably anticipated use, namely as an implanted port/catheter system to administer intravenous fluids and/or medications. Defendants failed to adequately warn of the device's known or reasonably scientifically knowable dangerous propensities, and further failed to adequately provide instructions on the safe and proper use of the device.

94. Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of the AngioDynamics Port; no reasonable health care provider, including Plaintiff, or patient would have used the device in the manner directed, had those facts been made known to the prescribing healthcare providers or the consumers of the device.

95. Defendants knew or should have known at the time they manufactured, labeled, distributed, and sold the AngioDynamics Port that was implanted into Plaintiff that the AngioDynamics Port posed a significant and higher risk than other similar devices of device failure and resulting serious injuries.

96. The warnings, labels, and instructions provided by the Defendants at all times relevant to this action, are and were inaccurate, intentionally misleading, and misinformed and misrepresented the risks and benefits and lack of safety and efficacy associated with the device.

97. The health risks associated with the device as described herein are of such a nature that ordinary consumers would not have readily recognized the potential harm.

98. The AngioDynamics Port, which was designed, manufactured, prepared,

compounded, assembled, processed, marketed, labeled, distributed, and sold into the stream of commerce by Defendants, was defective at the time of release into the stream of commerce due to inadequate warnings, labeling and/or instructions accompanying the product.

99. When Plaintiff was implanted with his device, Defendants failed to provide adequate warnings, instructions, or labels regarding the severity and extent of health risks posed by the device, as discussed herein.

100. Defendants intentionally underreported the number and nature of adverse events associated with infection due to AngioDynamics Ports to Plaintiff's health care providers, as well as the FDA.

101. Neither Plaintiff nor his health care providers knew of the substantial danger associated with the intended and foreseeable use of the device as described herein.

102. Plaintiff and his health care providers used the AngioDynamics Port in a normal, customary, intended, and foreseeable manner, namely as a surgically placed device used to make it easier to deliver medications directly into the patient's bloodstream.

103. Upon information and belief, the defective and dangerous condition of AngioDynamics Ports existed at the time they were manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold by Defendants to distributors and/or healthcare professionals or organizations.

104. Upon information and belief, the AngioDynamics Port implanted in Plaintiff was in the same condition as when it was manufactured, inspected, marketed, labeled, promoted, distributed and sold by Defendants.

105. Defendants' lack of sufficient warning and/or instructions was the direct and proximate cause of Plaintiff's serious physical injuries, and economic damages in an amount to be determined at trial. In other words, had Defendants provided adequate warnings, Plaintiff and his physicians would not have used the AngioDynamics Port.

## COUNT VII: BREACH OF IMPLIED WARRANTY

(Against Defendants AngioDynamics, Navilyst, and PFM Medical)

106. Plaintiff incorporates by reference paragraphs one (1) through sixty-three (63) of this Complaint as if fully set forth herein .

107. Defendants impliedly warranted that the AngioDynamics Port was merchantable and fit for the ordinary purposes for which it was intended.

108. When the AngioDynamics Port was implanted in the Plaintiff, it was being used for the ordinary purposes for which it was intended.

109. The Plaintiff, individually and/or by and through his physicians, relied upon Defendants' implied warranties of merchantability in consenting to have the AngioDynamics Port implanted in him.

110. Privity exists between Plaintiff because Plaintiff's physicians acted as Plaintiff's purchasing agents in the subject transaction and/or because Plaintiff was a third-party beneficiary of the subject contract.

111. Plaintiff was the intended consumer of the device when Defendants made the warranties set forth herein, and such warranties were made to benefit Plaintiff as a patient and consumer.

112. Defendants breached these implied warranties of merchantability because the AngioDynamics Port implanted in Plaintiff was neither merchantable nor suited for its intended uses as warranted in that the device varied from its intended specifications, which included, but are not limited to, variances in the following respects:

a. Defendants' manufacturing process in constructing the catheter of the AngioDynamics Port implanted in Plaintiff involved too high of a concentration of barium sulfate particles for the polymer formulation, which led to improperly high viscosity of the admixed silicone before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix;

b. Defendants' knew or should have known barium sulfate is known to contribute to a reduction in the mechanical integrity of the silicone in its

product, the AngioDynamics Port, as the barium sulfate particles dissociate from the surface of the catheter over time; and

c. These defects led to a heterogenous modified polymer that included microfractures and weakened areas at the location of the higher barium sulfate concentration that ultimately led to the collection and proliferation of blood products, thereby drastically increasing the risk of biofilm, infection, sepsis.

113. Defendants' breaches of their implied warranties resulted in the implantation of an unreasonably dangerous and defective product, the AngioDynamics Port, into Plaintiff’s body, placing Plaintiff’s health and safety in jeopardy.

114. The AngioDynamics Port was sold to Plaintiff’s health care providers for implantation in patients, such as Plaintiff.

115. As a direct and proximate result of Defendants’ breaches of the aforementioned implied warranties, the Plaintiff severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

116. Upon information and belief, Plaintiff’s healthcare providers sent notice to Defendants of the adverse event that occurred to Plaintiff and thus, the nonconformity of the AngioDynamics Port, within a reasonable period of time following discovery of the breach of warranty and before suit was filed.

## COUNT VIII: BREACH OF EXPRESS WARRANTY

(Against Defendants AngioDynamics, Navilyst, and PFM Medical)

117. Plaintiff incorporates by reference paragraphs one (1) through sixty-three (63) of this Complaint as if fully set forth herein .

118. Defendants through their officers, directors, agents, representatives, and written literature and packaging, and written and media advertisement, expressly warranted that the AngioDynamics Port was safe and fit for use by consumers, was of merchantable

quality, did not produce dangerous side effects, and was adequately tested and fit for its intended use.

119. The AngioDynamics Port does not conform to the Defendants' express representations because it is not reasonably safe, has numerous serious side effects, and causes severe and permanent injury.

120. Defendants further breached express representations and warranties made to Plaintiff, his physicians and healthcare providers with respect to the AngioDynamics Port implanted in Plaintiff in the following respects:

a. Defendants represented to Plaintiff and his physicians and healthcare providers through product labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions among other ways that the Defendants' AngioDynamics Port was safe, meanwhile Defendants fraudulently withheld and concealed information about the substantial risks of serious injury associated with using AngioDynamics Port;

b. Defendants represented to Plaintiff and his physicians and healthcare providers that the Defendants' AngioDynamics Port was as safe and/or safer than other alternative procedures and devices then on the market, meanwhile Defendants fraudulently concealed information that demonstrated that AngioDynamics Port was not safer than alternative therapies and products available on the market; and

c. Defendants represented to Plaintiff and his physicians and healthcare providers that the Defendants' AngioDynamics Port was more efficacious than other alternative procedures, therapies and/or devices. Meanwhile Defendants fraudulently concealed information, regarding the true efficacy of AngioDynamics Port.

121. At all relevant times, the AngioDynamics Port did not perform as safely as an ordinary consumer would expect, when used as intended or in a reasonably foreseeable

manner.

122. Plaintiff, his physicians, and the medical community reasonably relied upon the Defendants' express warranties for the AngioDynamics Port.

123. Plaintiff was the intended consumer of the AngioDynamics Port when Defendants made the warranties set forth herein, and such warranties were made to benefit Plaintiff as a patient and consumer.

124. At all relevant times, the AngioDynamics Port was used on Plaintiff by Plaintiff's physicians for the purpose and in the manner intended by Defendants.

125. Plaintiff and Plaintiff's physicians, by the use of reasonable care, could not have discovered the breached warranty and realized its danger.

126. As a direct and proximate result of the breach of Defendants' express warranties, Plaintiff severe physical pain and injuries which were permanent and lasting in nature, emotional distress, loss of the capacity for the enjoyment of life, medical and nursing expenses, surgical expenses, and economic loss as alleged herein.

127. Upon information and belief, Plaintiff's healthcare providers sent notice to Defendants of the adverse event that occurred to Plaintiff and thus, the nonconformity of the AngioDynamics Port, within a reasonable period of time following discovery of the breach of warranty and before suit was filed.

## **COUNT IX: FRAUDULENT CONCEALMENT**

(Against Defendants AngioDynamics, Navilyst, and PFM Medical)

128. Plaintiff incorporates by reference paragraphs one (1) through sixty-three (63) of this Complaint as if fully set forth herein .

129. Defendants made false statements and representations to Plaintiff and his healthcare providers concerning the AngioDynamics Port product implanted in Plaintiff.

130. Defendants engaged in and fraudulently concealed information with respect to the AngioDynamics Port in the following respects:

a. Defendants represented through the product labeling, advertising,

marketing materials, seminar presentations, publications, notice letters, and regulatory submissions that the AngioDynamics Port was safe and fraudulently withheld and concealed information about the substantial risks of using the AngioDynamics Port, including, but not limited to, its heightened propensity to increase the risk of infection, and cause complications;

b. Defendants represented that the AngioDynamics Port was safer than other alternative systems and fraudulently concealed information which demonstrated that the AngioDynamics Port was not safer than alternatives available on the market;

c. Defendants concealed that it knew of the AngioDynamics Port's dangerous propensity to increase the risk of infection and was causing complications from causes other than the manner in which the implanting physician implanted the device; and

d. That frequency of these failures and the severity of injuries were substantially worse than had been reported.

131. Defendants had knowledge that the representations they made concerning the AngioDynamics Port, as stated above, were false.

132. Defendants had sole access to material facts concerning the dangers and unreasonable risks of the AngioDynamics Port.

133. The concealment of information by the Defendants about the risks of the AngioDynamics Port was intentional.

134. The concealment of information and the misrepresentations about the AngioDynamics Port was made by the Defendants with the intent that Plaintiff's health care providers and Plaintiff rely upon them.

135. Plaintiff and his physicians relied upon the representations and were unaware of the substantial risks of the AngioDynamics Port which the Defendants concealed from the public, including Plaintiff and his physicians.

136. As a direct and proximate result of the Defendants' actions, omissions and misrepresentations, Plaintiff severe physical pain and injuries which were permanent and lasting in nature, emotional distress, loss of the capacity for the enjoyment of life, medical and nursing expenses, surgical expenses, and economic loss as alleged herein.

137. The Defendants acted with oppression, fraud, and malice towards Plaintiff, who accordingly requests that the trier of fact, in the exercise of its sound discretion, award additional damages for the sake of example and for the purpose of punishing Defendants for their conduct, in an amount sufficiently large to be an example to others, and to deter this Defendants and others from engaging in similar conduct in the future.

138. Had Defendants not concealed this information, neither Plaintiff nor his health care providers would have consented to using the AngioDynamics Port placed in Plaintiff.

## COUNT X: VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT (“ACFA”) - ARIZ. REV. STAT. ANN. §44-1521, *et seq.*

(Against Defendants AngioDynamics, Navilyst, and PFM Medical)

139. Plaintiff incorporates by reference paragraphs one (1) through sixty-three (63) of this Complaint as if fully set forth herein.

140. Plaintiff purchased the AngioDynamics Port, and the product was intended for personal use.

141. The acts and practices engaged in by Defendants as outlined above constitute unlawful, unfair, and/or fraudulent business practices in violation of the Arizona Consumer Fraud Act, ARIZ. REV. STAT. ANN. §44-1521, *et seq.*, (the “ACFA”).

142. Defendants engaged in unlawful practices including deception, false promises, misrepresentation, and/or the concealment, suppression, or omission of material facts in connection with the sale, distribution, and/or advertisement of the AngioDynamics Port in violation of the ACFA.

143. Plaintiff purchased the AngioDynamics Port, a product that was falsely represented, as set out above, as having certain characteristics and benefits it did not have,

*inter alia*, that it was reasonably safe for use, in violation of the ACFA.

144. Defendants further knowingly or recklessly engaged in unfair, unconscionable, deceptive, deliberately misleading, false, and/or fraudulent and deceptive acts and practices, all in violation of the ACFA, and as further described herein, which created a likelihood of confusion or misunderstanding on Plaintiff's part with respect to the AngioDynamics Port he purchased, including, but not limited to, misrepresenting that the AngioDynamics Port was reasonably safe for use and failing to adequately disclose the substantial risk of infection, and harm the product entailed given the large number of adverse events Defendants knew or should have been aware of but did not adequately disclose to Plaintiff.

145. Defendants' practices were likely to mislead consumers who acted reasonably to their detriment in purchasing the product based on Defendants' representations that it was reasonably safe for use when it in fact was not and had a greater propensity to increase the risk of infection due to its defective design and manufacturing.

146. Defendants intended for Plaintiff, Plaintiff's physicians, and other consumers to rely on their deceptive practices and representations in order to continue selling and manufacturing the AngioDynamics Port.

147. As a result, Plaintiff suffered economic damages in that the product purchased was misrepresented to be reasonably safe for use and was worth less than the product Plaintiff thought he had purchased had Defendants' representations been true.

## PRAYER

**WHEREFORE**, Plaintiff prays for judgment against each of the Defendants as follows:

a. Judgment be entered against all Defendants on all causes of action of this Complaint;

b. Plaintiff be awarded full, fair, and complete recovery for all claims and causes of action relevant to this action;

c. Plaintiff be awarded general and punitive damages according to proof at the time of trial;

d. Plaintiff be awarded damages, including past, present, and future, medical expenses according to proof at the time of trial;

e. Plaintiff be awarded costs and attorney's fees in connection with Plaintiff's claim under the Arizona Consumer Fraud Act, ARIZ. REV. STAT. ANN. §44-1521, *et seq.*;

f. Awarding pre-judgment and post-judgment interest to the Plaintiff;

g. Awarding the costs and the expenses of this litigation to the Plaintiff;

h. For such other and further relief as the court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury on all issues.

Respectfully submitted,

*/s/ R. Andrew Jones*

R. Andrew Jones (Admitted *Pro Hac Vice*)
Cory Watson, P.C.
2131 Magnolia Ave South
Birmingham, AL 35205
Telephone: (205) 328-2200
Fax: (205) 324-7896
ajones@corywatson.com

Jon C. Conlin (Admitted *Pro Hac Vice*)
Cory Watson, P.C.
2131 Magnolia Ave South
Birmingham, AL 35205
Telephone: (205) 328-2200
Fax: (205) 324-7896
jconlin@corywatson.com

Nicolas Gutierrez (Admitted *Pro Hac Vice*)
Cory Watson, P.C.
2131 Magnolia Ave South
Birmingham, AL 35205
Telephone: (205) 328-2200
Fax: (205) 324-7896
ngutierrez@corywatson.com

*ATTORNEYS FOR PLAINTIFF*